1

2

3

4

5

6

7

8  **UNITED STATES DISTRICT COURT**

9  **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 MIGUEL ANGEL FERNANDEZ CRESPO,      CASE NO. 11-cv-3019 – IEG (POR)

12                      Petitioner,      **ORDER GRANTING IN PART AND DENYING IN PART HABEAS**
     vs.                                  **PETITION**

13

14 ROBIN BAKER, Field Office Director, San      [Doc. No. 1]
Diego District, United States Bureau of

15 Immigration and Customs Enforcement
(ICE); KENNETH SMITH, Assistant Field

16 Office Director, San Diego District, ICE;
JOHN MORTON, Assistant Secretary, ICE;

17 JANET NAPOLITANO, Secretary,
Department of Homeland Security; and ERIC

18 HOLDER, United States Attorney General,

19                      Respondents.

20

21        Petitioner Miguel Angel Fernandez Crespo ("Petitioner") filed a petition for writ of habeas

22 corpus relief pursuant to 28 U.S.C. § 2241 ("Petition"), seeking his immediate release from the

23 Department of Homeland Security ("DHS")'s custody under reasonable conditions of supervision,

24 or in the alternative, a constitutionally adequate bond hearing before an Immigration Judge ("IJ").

25 [Doc. No. 1.]  In response to the Court's Order to Show Cause, Respondents filed a return to the

26 Petition, contending that Petitioner's detention is not indefinite and has not been unduly prolonged

27 and that Petitioner is not entitled to a bond hearing.  [Doc. No. 10.]  On February 9, 2012

28 Petitioner filed his traverse.  [Doc. No. 13.]  For the reasons set forth below, the Court **GRANTS**

1  **IN PART** and **DENIES IN PART** the Petition.

2                                    <u>BACKGROUND</u>

3  **I.      Factual background**

4          Petitioner is a native and citizen of Cuba and was born in Havana, Cuba in 1965.  [Doc.

5  No. 1 ¶ 15.]  In 1989, Petitioner became active in El Partido Pro Los Derechos Humanos de Cuba

6  (The Pro-Human Rights Party of Cuba) (hereafter "Human Rights Party"), a political party

7  opposed to the Castro regime.  [<u>Id.</u> ¶ 16.]  Several months after joining the Human Rights Party,

8  Petitioner met with another anti-Castro group called Grupo Juvenil Por Los Derechos Humanos

9  (Youth Group for Human Rights) (hereafter "Grupo Juvenil") a few times over the course of

10  several months.  [<u>Id.</u> ¶ 17.]  At one of the meetings, a member of Grupo Juvenil suggested that the

11  group should destroy a public library.  [<u>Id.</u> ¶ 18.]  Petitioner remarked that that plan would be a

12  bad idea, because the library was a national monument and attacking it would risk injuring people.

13  [<u>Id.</u>]  Petitioner told the group that it would be a better idea to destroy a fleet of new tour buses,

14  which would hurt the Castro regime without injuring anyone.  [<u>Id.</u>]  Petitioner alleges that Grupo

15  Juvenile never took any steps to implement these ideas.  [<u>Id.</u>]

16          In November 1989, Petitioner attempted to escape Cuba for the United States on a

17  makeshift raft, but he was arrested by Cuban authorities.  [Doc. No. 1 ¶ 20.]  Petitioner was held

18  by the Department of State Security, which handles cases involving political dissidents, and

19  questioned about his involvement with Grupo Juvenil.  [<u>Id.</u> ¶¶ 20-21.]  Petitioner told the agents

20  that the group had discussed attacking targets, but that they never intended to actually do anything.

21  [<u>Id.</u> ¶ 21.]

22          On July 20, 1990, Petitioner and nine member of Grupo Juvenil were given a one-day trial

23  before a special court called the "Court for Crimes against National Security."  [Doc. No. 1 ¶ 22.]

24  Petitioner states at the trial there was no jury, independent judge, effective assistance of counsel,

25  meaningful right to examine the government's evidence, or ability to confront adverse witnesses.

26  [<u>Id.</u>]  At the conclusion of the trial, all of the defendants were summarily found guilty of political

27  offenses and Petitioner was convicted of "terrorism" and sentenced to fifteen years incarceration-

28  enhanced to seventeen years based on his attempt to flee the country.  [<u>Id.</u> ¶¶ 22, 26.]  While in

1  prison, Petitioner was recognized as a political prisoner by the Vatican, specifically Pope John

2  Paul II, and the United States Agency on International Development.  [Id. ¶¶ 28, 31, Ex. C.]

3        Petitioner was conditionally released from prison around January 2001.  [Doc. No. 1 ¶ 32.]

4  Petitioner alleges that after his release he was consistently harassed and threatened by agents of the

5  Castro regime.  [Id.]  In 2008, Petitioner moved to Sweden, then Spain, and then Mexico.  [Id. ¶

6  33.]  On December 12, 2012, Petitioner arrived at the San Ysidro Port of Entry and requested

7  asylum.  [Id. ¶ 34; Doc. No. 10-1, Ex. D.]

8        A Customs and Border Patrol Officer interviewed Petitioner regarding his asylum claim,

9  and Petitioner admitted that he had been convicted in Cuba for terrorism charges.  [Doc. No. 10-1,

10  Ex. E.]  Following the interview, the officer determined that Petitioner has expressed a credible

11  fear of returning to Cuba and initiated removal proceeding against Petitioner by issuing a Notice to

12  Appear ("NTA") in Immigration Court.  [Id., Ex. F.]  The NTA charged Petitioner with

13  removability pursuant to 8 U.S.C. § 1182(a)(7)(i)(I), as an alien who, at the time of application for

14  admission, did not possess a valid immigration visa, reentry permit, border crossing card or other

15  valid entry document.  [Id.]  Upon issuance of the NTA, DHS took Petitioner into custody and

16  placed him in the San Diego Correctional Facility, where he currently remains.  [Doc. No. 1 ¶ 34.]

17        On April 5, 2011, Petitioner appeared before an Immigration Judge ("IJ") for the first time

18  with counsel and indicated that he would admit the removeability charges but would also seek

19  relief in the form of asylum, withholding of removal, and deferral of removal pursuant to the

20  Convention Against Torture.  [Doc. No. 10-1, Ex. U.]  A merits hearing was originally scheduled

21  for May 20, 2011, but it has been continued several times and the hearing has yet to be completed.

22  [Id., Exs. U-Y.]

23        On November 1, 2011, Petitioner submitted a request to DHS for parole and release from

24  custody.  [Doc. No. 10-1, Declaration of Yadira G. Avalos ("Avalos Decl.") ¶ 5.]  On November

25  18, 2011, a DHS officer denied Petitioner's request for parole on the basis that he is a threat to the

26  United States and the community.  [Id. ¶ 7, Ex. R.]

27  ///

28  ///

1    **II.    Procedural background**

2        On December 27, 2011, Petitioner filed the present Petition for writ of habeas corpus relief

3    pursuant to 28 U.S.C. § 2241, seeking his immediate release from DHS's custody under

4    reasonable conditions of supervision, or in the alternative, a constitutionally adequate bond

5    hearing before an IJ.  [Doc. No. 1 at 20-21.]  Petitioner argues that he is entitled to such relief

6    based on four grounds: (1) there is no significant likelihood that he will be removed; (2) DHS's

7    denial of his parole request on the grounds that Petitioner is a danger to the community or national

8    security is facially illegitimate and arbitrary and capricious; (3) his detention environment is

9    excessive in relation to the purposes of his detention, which could be accomplished through less

10   restrictive alternatives; and (4) DHS cannot continue to detain him unless it demonstrates in a

11   bond hearing before a neutral decision maker that he is a flight risk or a danger to the community.

12   [Id. at 3-5, 13-18.]  On January 25, 2012, in light of the Petition, the IJ in Petitioner's removal

13   proceedings continued the proceedings until this Court's resolution of the Petition.  [Doc. No. 10-

14   1, Norris Decl. ¶ 16.]  On January 26, 2012, Respondents filed a return to the Petition, arguing that

15   Petitioner was not entitled to immediate release or a bond hearing.  [Doc. No. 10.]  On February 9,

16   2012, Petitioner filed his traverse.  [Doc. No. 13.]

17                                          **DISCUSSION**

18   **I.    Jurisdiction**

19       Although the parties have not raised the issue of whether the Court has jurisdiction over the

20   Petition, the Court must consider the issue *sua sponte*.  See Justices of Boston Mun. Court v.

21   Lydon, 466 U.S. 294, 300-02 (1984); Nadarajah v. Gonzales, 443 F.3d 1069, 1075 (9th Cir. 2006).

22   Pursuant to the REAL ID Act of 2005, a petition for review to the appropriate court of appeals is

23   the sole and exclusive means for judicial review of a final order of removal, deportation, or

24   exclusion, and district courts do not have statutory or non-statutory habeas jurisdiction over such

25   orders.  See 8 U.S.C. § 1252; Martinez-Rosas v. Gonzales, 424 F.3d 926, 928-29 (9th Cir. 2005).

26   Here, Petitioner's removal proceedings are still ongoing, and there has been no final order of

27   removal.  Accordingly, the Court has federal habeas jurisdiction over the Petition pursuant to 28

28   U.S.C. § 2241.  See Nadarajah, 443 F.3d at 1075-76.

1  **II.      Merits**

2          A.      Statutory authority for detention

3          The parties agree that petitioner is being held pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii).

4  [Doc. No. 1 at 13; Doc. No. 10 at 5.]  Section 1225(b)(1)(B)(ii) provides that noncitizens seeking

5  admission who are found to have a credible fear of persecution "shall be detained for further

6  consideration of the application for asylum."  8 U.S.C. § 1225(b)(1)(B)(ii).  Upon his entry into

7  the United States, a Customs and Border Patrol Officer determined that Petitioner was a citizen of

8  Cuba, who possessed no valid documentation to enter, pass through, or remain in the United States

9  and was seeking political asylum.  [Doc. No. 10-1, Exs. D, F.]  The officer determined that

10  Petitioner had expressed a credible fear of returning to Cuba and initiated removal proceedings

11  against him by issuing a Notice to Appear in Immigration Court.  [Id.]  Therefore, Petitioner could

12  be properly detained by DHS pursuant to 8 U.S.C. § 1225(b)(1)(B)(ii) when he attempted to gain

13  admission into the United States.

14          B.      Detention Without Significant Likelihood of Removal

15          Petitioner argues that he is entitled to immediate release because there is no significant

16  likelihood that he will be removed to Cuba.  [Doc. No. 1 at 14-16.]  In response, Respondents

17  argue that Petitioner has not shown that there is no significant likelihood that he could be removed

18  to Sweden, Spain, or Mexico, countries that have repatriation agreements with the United States

19  and where Petitioner had settled before coming to the United States.  [Doc. No. 10 at 9-10.]

20          In Zadvydas v. Davis, the Supreme Court held that an alien may not be indefinitely

21  detained following a final order of removal pursuant to 8 U.S.C. § 1231(a)(6).  533 U.S. 678, 682

22  (2001); see also id. at 690 ("A statute permitting indefinite detention of an alien would raise a

23  serious constitutional problem.").  The Supreme Court explained that for six months following the

24  beginning of the removal period an alien's detention is presumptively authorized.  Id. at 701.

25  However, after that period, "once the alien provides good reason to believe that there is no

26  significant likelihood of removal in the reasonably foreseeable future, the Government must

27  respond with evidence sufficient to rebut that showing" in order to continue to detain the alien.  Id.

28  The Ninth Circuit has extended the Zadvydas framework to discretionary detention pursuant to

1  section 1225(b), finding that indefinite detention under this statute poses the same constitutional

2  concerns present in Zadvydas.  See Nadarajah, 443 F.3d at 1078-80 (concluding that the general

3  immigration detention statutes, 8 U.S.C. § 1225(b)(1)(B)(ii) and (b)(2)(A), do not authorize

4  indefinite detention, but rather permit only detention for the reasonable period set forth in

5  Zadvydas).

6         DHS took Petitioner into custody upon the issuance of his Notice to Appear on December

7  13, 2010, [Doc. No. 10-1, Ex. F], and Petitioner has remained in the custody of DHS for over one

8  year.  Accordingly, Petitioner's detention is no longer presumptively reasonable, and Petitioner

9  should be released if he can provide good reason to believe that there is no significant likelihood

10  of removal in the reasonably foreseeable future.  See Zadvydas, 533 U.S. at 701; Nadarajah, 443

11  F.3d at 1079-80.

12         Petitioner argues that there is no significant likelihood that he could be removed to Cuba.

13  [Doc. No. 1 at 14-16.]  The Court agrees.  In Clark v. Martinez, the Supreme Court explained that

14  there was no substantial likelihood that the detainees in that case would be removed to Cuba,

15  because the United States does not have a repatriation agreement with Cuba.  543 U.S. 371, 387

16  (2005); see also Jardines-Guerra v. Ashcroft, 262 F. Supp. 2d 1112, 1115 (S.D. Cal. 2003).

17  Further, Respondents have not provided any evidence or argument showing that Petitioner could

18  be removed to Cuba, in an attempt to rebut's Petitioner's showing.

19         However, Cuba is not the only country that has been designated as a country of removal.

20  The IJ designated Mexico as an alternative country of removal.  [Doc. No. 10-1, Ex. Y at 25-26.]

21  Petitioner has not presented any argument or evidence showing that there is no substantial

22  likelihood he will be removed to Mexico.  Instead, Petitioner argues that DHS has failed to come

23  forward with any evidence showing that he would be allowed to legally reside in Mexico.

24  However, this argument fails to consider the proper burden of production as explained by the

25  Supreme Court in Zadvydas.  Pursuant to Zadvydas, Petitioner has the initial burden of showing

26  that there is good reason to believe that there is no significant likelihood that he will be removed to

27  Mexico.  533 U.S. at 701.  Only after Petitioner has made this showing is the Government required

28  to rebut that showing.  Id.  Because Petitioner has failed to present any argument or evidence

1  showing that he could not be removed to Mexico, Petitioner has failed meet his initial burden of

2  showing that there is good reason to believe there is no significant likelihood that he will be

3  removed to Mexico.  Accordingly, the Court **DENIES WITHOUT PREJUDICE** the Petition on

4  the grounds that there is no significant likelihood that Petitioner will be removed.

5        C.    Arbitrary and Capricious Denial of Parole

6        Petitioner argues DHS abused its discretion in denying him parole because the denial was

7  facially illegitimate and in the absence of any plausible security reason for his ongoing detention.

8  [Doc. No. 1 at 18.]  In response, Respondents argue that Petitioner's terrorism conviction by the

9  Cuban Court was a facially legitimate and bona fide reason for DHS to deny him parole.  [Doc.

10  No. 10 at 11-13.]

11        8 U.S.C. 1182(d)(5)(A), provides in pertinent part:

12        The Attorney General may . . . in his discretion parole into the United States
          temporarily under such conditions as he may prescribe only on a case-by-case basis
13        for urgent humanitarian reasons or significant public benefit any alien applying for
          admission to the United States, but such parole of such alien shall not be regarded
14        as an admission of the alien.

15  The Ninth Circuit has explained that the Attorney General, through his officials, has broad

16  discretion in making a parole decision although this discretion "is not without limits."  Nadarajah,

17  443 F.3d at 1082.  Immigration officials have the authority to deny parole to unadmitted aliens as

18  long as the officials can advance "'a facially legitimate and bona fide reason for doing so.'"  Id.

19  (quoting Jean v. Nelson, 472 U.S. 846, 853 (1985)).  "If such a reason is advanced, the denial of

20  parole is essentially unreviewable."  Id.

21        The record shows that DHS denied Petitioner parole based on his terrorism conviction by

22  the Cuban court and the fact that, based on his Cuban conviction, Petitioner was denied refugee

23  status in the United States, Canada, and Germany.  [Doc. No. 10-1, Avalos Decl. ¶ 7, Ex. R.]

24  Specifically, the officer noted that Petitioner's conviction for terrorism was based on Petitioner's

25  involvement with a youth human rights group that had planned to use explosives at a tourist site to

26  hurt the tourist industry.  [Id. Ex. R.]  This information constitutes a legitimate and bona fide

27  reason for DHS to conclude that Petitioner is a threat to the community and the United States and

28  to deny Petitioner parole.

1    Petitioner argues that his Cuban conviction cannot constitute a legitimate and bona fide

2  reason because his conviction was obtained through fundamentally unfair proceedings and

3  involved actions that would be protected in this country by the First Amendment as free speech.

4  [Doc. No. 13 at 10-12.]  In arguing that the Cuban conviction is not facially legitimate, Petitioner

5  relies exclusively on the Ninth Circuit's decision in Nadarajah.  However, Petitioner's present

6  circumstances are extremely different from the detainee in Nadarajah.  In Nadarajah, the Ninth

7  Circuit determined that the government did not have a legitimate and bona fide reason for denying

8  parole where the detainee was initially granted parole, but when the detainee was able to obtain

9  enough money to pay the bond, parole was denied because the bond was stale.  433 F.3d at 1082.

10  In addition, the detainee had been awarded relief by both the BIA and the IJ, and both the IJ and

11  the BIA had rejected the government's position that the detainee was a security risk.  Id. at 1082-

12  83.  In contrast, here, Petitioner was never initially granted parole, Petitioner has not yet obtained

13  any of the relief he is requesting, and neither an IJ or the BIA has rejected the government's

14  position that Petitioner is a security risk based on his terrorism conviction.  Therefore, the

15  government's reliance on Petitioner's terrorism conviction at this time constitutes a legitimate and

16  bona fide reason for denying parole.

17    The Court recognizes that the evidence relied on by DHS is fairly weak.  See Cheema v.

18  Ashcroft, 383 F.3d 848, 858 (9th Cir. 2004) ("[I]t is by no means self-evident that a person

19  engaged in extra-territorial or resistance activities–even militant activities–is necessarily a threat to

20  the security of the United States.  One country's terrorist can often be another country's

21  freedom-fighter.").  However, because the evidence is enough to constitute a facially legitimate

22  and bona fide reason for denying parole, DHS's decision to deny Petitioner parole is essentially

23  unreviewable by this Court.  See Nadarajah, 443 F.3d at 1082.  Accordingly, the **DENIES**

24  **WITHOUT PREJUDICE** the Petition on the grounds that DHS abused its discretion in denying

25  Petitioner parole.

26    D.    Excessively Harsh Detention

27    Petitioner argues that his ongoing detention is causing him serious psychological suffering

28  that it is excessive in relation to the purposes of his detention, in violation of his substantive due

1    process rights.  [Doc. No. 1 at 18.]  Respondents did not address this claim in their return to the

2    Petition.

3        In support of his substantive due process claims, Petitioner relies on Jones v. Blanas, 393

4    F.3d 918 (9th Cir. 2004).  In Jones, the Ninth Circuit held that "a civil detainee awaiting

5    adjudication is entitled to conditions of confinement that are not punitive."  393 F.3d at 933.  A

6    restriction is "punitive" where it is intended to punish, or where it is excessive in relation to its

7    non-punitive purpose, or is employed to achieve objectives that could be accomplished in so many

8    alternative and less harsh methods.  Id. at 933-34.  In determining whether confinement is punitive

9    in nature, a "court must decide whether the disability is imposed for the purpose of punishment or

10   whether it is but an incident of some other legitimate governmental purpose . . . [a]bsent a showing

11   of an intent to punish . . . that determination generally will turn on 'whether an alternative purpose

12   to which [the restriction] may rationally be connected is assignable for it, and whether it appears

13   excessive in relation to the alternative purpose assigned [to it].'"  Bell v. Wolfish, 441 U.S. 520,

14   537 (1979) (citations omitted).

15       Petitioner concedes that his detention is non-punitive.  [Doc. No. 1 at 18.]  Indeed, the

16   record shows that Petitioner is being detained pursuant to legitimate non-punitive reasons, to

17   facilitate his removal from the United States and to alleviate DHS's concerns that Petitioner is a

18   threat to the community and to the United States.  [Doc. No. 10-1, Ex. R.]  See Zadvydas, 533 U.S.

19   at 690 (stating that civil detention in immigration proceedings is "nonpunitive in purpose and

20   effect").  Petitioner argues that his confinement is excessive because it is causing him mental

21   health problems and there are many less harsh alternatives to detention for someone like him, such

22   as community or faith-based programs, telephonic reporting to DHS, and electronic monitoring.

23   [Doc. No. 1 at 13.]  However, all of these alternatives would require Petitioner's release from the

24   San Diego Correctional Facility and are, therefore, inadequate to alleviate DHS's concerns that

25   Petitioner is a threat to the community and the United States.  Because DHS has determined that

26   Petitioner is a threat to the community and the United States, his detention in the SDCF is not

27   excessive.  Petitioner may be able to prove during the removal proceedings that he is not a threat

28   to the community and the United States, but he has not done so yet.  All that is contained in the

1 record is the DHS's denial of Petitioner's parole request, which as stated above determined that he

2 is a threat and is essentially unreviewable by this Court.  See supra section II.C.  Accordingly, the

3 Court **DENIES WITHOUT PREJUDICE** the Petition on the grounds that Petitioner's

4 confinement violates his substantive due process rights.

5        E.      Prolonged Detention Without a Bond Hearing

6        Petitioner argues that because his detention has become prolonged, he cannot be detained

7 unless DHS persuades a neutral decision maker that he is a flight risk or a danger to the

8 community.  [Doc. No. 1 at 16-18.]  Respondents argue that an "arriving alien," like Petitioner, is

9 not entitled to a bond hearing and is only entitled to judicial review of the DHS's decision to deny

10 parole as provided by the Ninth Circuit in Nadarajah.  [Doc. No. 10 at 7-9.]

11        i.      Applicable case law

12        In Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 949-52 (9th Cir. 2008), the

13 Ninth Circuit determined that an alien detained under § 1226(a) whose detention has become

14 prolonged has the right to bond hearing before a neutral decision maker where the government has

15 the burden of establishing that the alien is a flight risk or a danger to the community.  "Because the

16 prolonged detention of an alien without an individualized determination of his dangerousness or

17 flight risk would be 'constitutionally doubtful,'" the Ninth Circuit concluded "that § 1226(a) must

18 be construed as requiring the Attorney General to provide the alien with such a hearing."  Id.

19 (citation omitted); see also Prieto-Romero v. Clark, 534 F.3d 1053, 1065-66 (9th Cir. 2008)

20 (finding that three bond hearings for an alien detained under § 1226(a) satisfied due process);

21 Tijani v. Willis, 430 F.3d 1241, 1242 (9th Cir. 2005) (finding that an alien detained for nearly

22 three years could not be mandatorily detained under § 1226(c) and ordering a bond hearing,

23 impliedly finding that the alien was detained under § 1226(a)).

24        More recently, in Diouf v. Mukasey (Diouf II), 634 F.3d 1081, 1084 (9th Cir. 2011), the

25 Ninth Circuit concluded that an alien detained under § 1231(a)(6) is entitled to the same

26 procedural safeguards against prolonged detention as one detained under § 1226(a).  The Ninth

27 Circuit rejected the government's argument that the "important interest" at stake—freedom from

28 prolonged detention—was less for aliens detained while seeking collateral judicial review of

administratively final orders of removal as compared to those seeking direct review. Id. at 1087. The Ninth Circuit also emphasized that while the government's interest in "ensuring that aliens are available for removal if their legal challenges do not succeed" may be "marginally greater" with respect to aliens detained under § 1231(a)(6) than those detained under § 1226(a), the proper place to consider this interest was by the immigration judge at the bond hearing, rather than by "categorically denying to § 1231(a)(6) detainees the right to a bond hearing that § 1226(a) detainees already enjoy." Id. at 1087-88. The Ninth Circuit rejected the government's argument that § 1231(a)(6) warranted a different analysis because, unlike § 1226(a), it did not "expressly authorize release on bond." Id. at 1089. Further, the Ninth Circuit disagreed with the government that the DHS regulations providing for one or more "post-order custody reviews" ("POCRs") by DHS employees sufficiently safeguarded the liberty interests of § 1231(a)(6) detainees. Id. at 1089. The Ninth Circuit held that it would not defer to DHS regulations interpreting § 1231(a)(6) where those regulations "raise grave constitutional doubts." Id. at 1090. Finally, the Ninth Circuit explained that after an alien has been detained for approximately six months, the alien's continuing detention has become prolonged. Id. at 1091.

In Centeno-Ortiz v. Culley, 2012 U.S. Dist. LEXIS 5910, at *23-31 (S.D. Cal. Jan. 19, 2012), this Court relying on Casas-Castrillon and Diouf II held that an alien detained under § 1225(b)(2)(A) is entitled to the same procedural safeguards against prolonged detention as aliens detained under § 1231(a)(6) and § 1226(a). This Court explained that arriving aliens detained under § 1225(b)(2)(A) have the same "important interest" at stake as aliens detained under § 1226(a) and § 1231(a)(6)–"freedom from prolonged detention"–and the Government's interest in "ensuring that aliens are available for removal if their legal challenges do not succeed" is the same irrespective of whether they are detained under § 1226(a), § 1231(a)(6), or § 1225(b)(2)(A). Id. at *24. Like the Ninth Circuit in Diouf II, this Court also rejected the Government's contention that this Court should defer to DHS regulations because those regulations "raise grave constitutional doubts." Id. at *25-26.

///

///

ii.     Analysis

The parties agree that Petitioner is being detained under § 1225(b)(1)(B)(ii).  [Doc. No. 1 at 13; Doc. No. 10 at 5.]  The Court concludes that an alien detained under § 1225(b)(1)(B)(ii) is entitled to the same procedural safeguards against prolonged detention as aliens detained under § 1225(b)(2)(A), § 1231(a)(6), and § 1226(a).  Arriving aliens detained under § 1225(b)(1)(B)(ii) have the same important interest of "freedom from prolonged detention" at stake as aliens detained under the other three statutes, and the Government's interest in "ensuring that aliens are available for removal if their legal challenges do not succeed" is the same under all four statutes.  See Diouf II, 634 F.3d at 1087-88; Centeno-Ortiz, 2012 U.S. Dist. LEXIS 5910, at *24-25.  In addition, Respondent have provided no argument explaining why a bond hearing would be required under § 1225(b)(2)(A) but not under § 1225(b)(1)(B)(ii).

Petitioner was taken into DHS custody on December 13, 2010, over 15 months ago.  [Doc. No. 10-1, Ex. F.]  Therefore, Petitioner's detention has become prolonged.  See Diouf II, 634 F.3d at 1091.[1]  Because Petitioner is being detained pursuant to § 1225(b)(1)(B)(ii) and his detention has become prolonged, Petitioner is entitled to a bond hearing before a neutral decision maker where the Government has the burden of establishing that the alien is a flight risk or a danger to the community.  See Centeno-Ortiz, 2012 U.S. Dist. LEXIS 5910, at *14; Diouf II, 634 F.3d at 1086; Casas-Castrillon, 535 F.3d at 951.

Respondents argue that the Court should reconsider the conclusion it reached in Centeno-Ortiz.  [Doc. No. 10 at 8.]  However, Respondents provide no compelling reason for changing the Court's prior conclusion.  Respondents argue that the Court incorrectly stated that the issue in

---

[1] Respondents argue that Petitioner's detention has not been "unduly prolonged" and that his detention has become this length based on his own requests for more time, the IJ's continuances, and the complexity of the case.  [Doc. No. 10 at 10-11.]  The Court first notes that Respondents are not applying the correct standard.  Casas-Castrillon and Diouf II only require that the alien's detention has become "prolonged" not "unduly prolonged."  See Casas-Castrillon, 535 F.3d at 950-51; Diouf II, 634 F.3d at 1091.  Further, many of the cases relied on by Respondents are district court opinions issued prior to the Ninth Circuit's explanation of what constitutes prolonged detention in Diouf II.  Respondents also rely on Demore v. Kim, 538 U.S. 510 (2003), but that is a case involving mandatory detention under § 1226(c) and where the alien conceded he was deportable.  See id. at 517-18, 531.  Finally, even if the Court accepted Respondent's arguments that four and a half months of delay can be attributed to Petitioner and the Court did not consider that time period as part of his detention, Petitioner's detention would still be well over six months and thus "prolonged" under Diouf II.

11cv3019–IEG (POR)

1 Centeno-Ortiz was whether the Government can detain an arriving alien indefinitely without a

2 bond hearing because the legal analysis for "prolonged" and "indefinite" detentions are different.

3 [Doc. No. 10 at 8.]  The Court acknowledges that these are different standards and that it should

4 have used the word "prolonged" rather than "indefinite" in stating the legal issue presented in

5 Centeno-Ortiz.  However, this is of no consequence because in reaching its conclusion, the Court

6 relied on the "prolonged" detention line of cases–Tijani, Casas-Castrillon, and Diouf II–not the

7 "indefinite" detention line of cases.  Moreover, the Court's ultimate conclusion correctly states

8 that the Court "construe[s] § 1225(b)(2)(A) 'as requiring an individualized bond hearing, before an

9 immigration judge, for aliens facing prolonged detention under that provision.'  Such aliens are

10 entitled to release on bond unless the Government establishes that the alien is a flight risk or will

11 be a danger to the community.'"  Centeno-Ortiz, 2012 U.S. Dist. LEXIS 5910, at *29 (emphasis

12 added).

13 　　　Respondents also argue that Tijani, Casas-Castrillon, and Diouf II do not apply to aliens

14 detained under § 1225(b)(1)(B)(ii) because the prolonged detention of arriving aliens detained

15 pursuant to that statute is controlled by the Ninth Circuit's decision in Nadarajah.  [Doc. No. 10 at

16 7-8.]  Respondents contend that in Nadarajah, the Ninth Circuit held that prolonged detention

17 during pending administrative proceedings can only be remedied by releasing the detainee and not

18 by ordering a bond hearing.  [Id. at 7.]  However, there is no such holding contained in Nadarajah.

19 The Ninth Circuit in Nadarajah did not at any point address the issue of whether an alien detained

20 under § 1225(b)(1)(B)(ii) is entitled to a bond hearing before a neutral decision maker.  This is

21 unsurprising because–as Petitioner correctly notes--the petition in Nadarajah did not request a

22 bond hearing.  A case cannot be authority for an issue that was never considered by the court.  See

23 Zenith Laboratories, Inc. v. Carter-Wallace, Inc., 530 F.2d 508, 515 n.17 (3d Cir. 1976) ("Since

24 the court did not address the question at issue here, [that case] is not authority for [plaintiff's]

25 position.").  Accordingly, the Court **GRANTS IN PART** the Petition on the grounds that

26 Petitioner is entitled to a bond hearing before an immigration judge.

27 ///

28 ///

11cv3019–IEG (POR)

## CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** the

Petition. The Court declines to order Petitioner's immediate release from DHS's custody.

However, the Court **ORDERS** the Government to provide Petitioner with an individualized bond

hearing before an immigration judge with the authority to grant him bail, where the Government

will have the burden of establishing that Petitioner should not be released because he is either a

flight risk or will be a danger to the community within 60 days from the date of this Order.

**IT IS SO ORDERED.**

**Date:** April 3, 2012

**IRMA E. GONZALEZ**
**United States District Judge**

11cv3019–IEG (POR)